FILED
2012 Aug-09  PM 02:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| SOUTHLAND HEALTH | ) | |
| SERVICES, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 7:08-cv-2414-LSC |
| | ) | |
| BANK OF VERNON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF OPINION

## I. Introduction

Before the Court are three motions for summary judgment filed by the various Defendants; one from Citizens State Bank ("Citizens"), one jointly submitted by Bank of Vernon ("BOV") and West Alabama Bank and Trust ("WABT"), and one filed by Dudley Bell, Clanton Dubose, and T. Alan Walls (collectively the "individual defendants"). (Docs. 117, 118, and 119, respectively.) Each of these summary-judgment motions incorporates arguments that were made in earlier motions to dismiss. (*See* Doc. 117 at 4, 118 at 3, 119 at 4.) The Court therefore considers the arguments made in those earlier motions (Docs. 16, 19, 78, 80, and 83), and their associated briefs, in addition to the arguments presented in the present summary-

judgment motions and briefs. Also before the Court are three motions to strike, filed by Defendant Citizens. All of these motions have been fully briefed and are now ripe for decision.

## II. Facts[1]

Plaintiff Southland Health Services, Inc., ("Southland") was an ambulance and medical services company that operated across seven states through its various subsidiaries.[2] At one point it employed over 800 people. Plaintiff Larry Lunan ("Lunan") was the majority shareholder and CEO of Southland throughout the relevant time period, and was also the personal guarantor of Southland's debt. Southland then became wholly owned by Paladin Holdings ("Paladin"). Lunan is also the sole[3] shareholder and president of Paladin.

---

[1] The facts set out in this opinion are gleaned from the parties' individual submissions of facts claimed to be undisputed, their respective responses to those submissions, as well as the Court's own examination of the evidentiary record. Additional facts relevant to specific Defendants are given in the appropriate sections below. Wherever they are discussed, all reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] All of Southland's subsidiaries, including Emergystat, Inc., have assigned their claims to Southland, and to the extent they are discussed here, are included in the term "Southland."

[3] Because Plaintiffs refer to Lunan as "the shareholder" of Paladin, the Court assumes that he is the sole shareholder.

The Individual Defendants—Dudley Bell ("Bell"), Clanton Dubose ("Dubose"), and T. Alan Walls ("Walls")—were officers of Southland. Plaintiffs claim that over the course of three years, the individual defendants engaged in a scheme of intentionally devaluing the plaintiff corporations through the "systematic theft of checks and negotiable instruments, unauthorized use of company funds for payment of personal expenses, misuse of corporate credit cards, unauthorized checks and wire transfers to personal accounts, and other unauthorized takings of corporate monies and assets." (Doc. 75 at 6.) Plaintiffs claim that the defendant banks "disregarded obvious and suspicious circumstances, its own procedures, and industry norms in repeatedly cashing or accepting for deposit, without inquiry, over $3,000,000.00 in stolen checks that bore forged, unauthorized or missing endorsements." (Doc. 21 at 2.) Plaintiffs filed suit in this Court on December 29, 2008, for "violations of state and federal lending laws, civil RICO violations, conversion, violations of certain sections of Title 7 of the Alabama Code, unjust enrichment, money had and received, and various and sundry other violations of statutory law, federal law and Alabama common law." (Doc. 21 at 1.) The amended complaint, filed on May 2, 2011, listed a total of fourteen counts—some specific to the bank defendants, some specific to the individual defendants, and some against all Defendants. Since the filing of the amended complaint, the relevant issues have been

somewhat narrowed by Plaintiffs' voluntary dismissal of two other individual defendants, Susan Bell and Gary Bradford. (Doc. 87 at 4.) Plaintiffs have also voluntarily withdrawn Count Ten, alleging civil RICO violations, as to all defendants (Doc. 81 at 7, Doc. 82 at 1 n. 1) in addition to withdrawing Count Eleven—alleging fraudulent suppression—as against Citizens (Doc. 81 at 7).

## III. Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light

most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the movant has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV. Discussion

There are essentially three motions for summary judgment for the Court to consider. One was filed jointly by BOV and WABT, who share the same counsel. (Doc. 118.) Defendant Citizens filed its own motion. (Doc. 117.) Finally, the individual Defendants, who are represented jointly, filed a joint motion for summary judgment. (Doc. 119.) The analysis below addresses each of these three motions in turn.

### A. Claims against BOV and WABT

BOV and WABT raise a host of arguments in support of dismissal or summary judgment, including arguments based on statute of limitations, preemption, and other

defenses. They also point to the presence of arbitration agreements between them and the Plaintiffs. Notably, BOV and WABT raise arbitration last, asking the Court to first rule on their motions to dismiss and for summary judgment, and only then to send any remaining claims to arbitration. (Doc. 16 at 16, Doc. 118 at 34.) But as Plaintiffs point out, this would put the proverbial cart before the horse. (Doc. 21 at 2 n.1) Addressing the dispositive motions before considering the arbitration agreements would frustrate the purpose of the arbitration clause, and would unfairly provide BOV and WABT with "two bites at the apple." Instead, whenever enforcement of an arbitration agreement is requested, this Court is required to send the parties to arbitration "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration." 9 U.S.C. § 3. It does not matter that BOV and WABT wish to treat arbitration as a last-ditch effort rather than their first line of defense; since they have raised the issue, the first question for the Court is to determine whether the claims against them are "referable to arbitration."

### 1. Arbitration

BOV and WABT argue that this claim is subject to binding arbitration as a result of several arbitration agreements, entered into by Lunan both in his personal capacity and as a representative of Southland, and by Dubose as Vice President of Southland. Arbitration agreements between BOV or WABT and one or more Plaintiffs were

signed on March 3, 2006 (Doc. 16-5 at 1–2), October 7, 2006 (Doc. 16-7 at 1–2),

January 31, 2007 (Doc. 16-9 at 1), and November 6, 2007 (Doc. 16-3 at 1). The material

terms of these agreements are all identical:

> Lender and the undersigned acknowledge that all the transactions contemplated by this Agreement have a substantial impact on interstate commerce and agree that all disputes, claims, or controversies whether based upon any prior, current, or future agreement, loan, account, service, activity, transaction (proposed or actual), event or occurrence ("Disputes") whether individual, joint, or class in nature, including contract and tort disputes and any other matter at law or equity between them, their heirs, personal representatives, agents, employees, officers, directors, affiliated companies, parent companies, subsidiaries and shareholders, present, future or past ("Parties") shall be resolved by arbitration upon request of either party at any time, notwithstanding the prior filing by either party of any legal action, except as indicated in this Agreement or agreed to in writing by the parties. . . . It is understood and agreed that arbitration pursuant to this agreement shall be binding upon the Parties.

(Docs. 16-3 at 1, 16-5 at 1, 16-7 at 1, 16-9 at 1.) Plaintiffs raise essentially two arguments

against the enforcement of these arbitration agreements. First, they contend that the

arbitration agreements do "not relate to the acts alleged in Plaintiff's Complaint,"

making them inapplicable to the claims at issue. (Doc. 21 at 6.) Second, Plaintiffs

challenge "whether the Plaintiffs have agreed to arbitrate their claims *at all*," asserting

they are "non-signatories" who are outside the arbitration agreements in question. (Doc. 21 at 10.)

### a. Claims subject to the arbitration agreement

The crux of Plaintiffs' first argument is that a dispute, in order to be arbitrable, must be "characterized as arising out of or relating to the subject matter of the contract." (Doc. 21 at 7 (quoting *Ex parte Cupps*, 782 S. 2d 772, 776 (Ala. 2000).) Plaintiffs cite several Alabama and Eleventh Circuit cases in support of this position, including *Amsouth Bank v. Dees*, 847 So. 2d 923 (Ala. 2002), and *Hemispherx Biopharma, Inc. v. Johannesburg Consol. Investments*, 553 F.3d 1351 (11th Cir. 2008). Plaintiffs claim that "[h]ere, just as in *Hemispherx Biopharma, Inc.*, the dispute does not fall within the scope of the agreements' arbitration clauses." (Doc. 21 at 10.) But in making this argument, Plaintiffs gloss over the language of the applicable agreements. In *Hemispherx*, for example, the court emphasized the limited scope of the agreement at issue there:

> This discussion takes place in the context of a class of arbitration agreements that use similar language, such as "arising from," "arising under," "pursuant to," and "arising during" the contract in question. The clause at issue in this case uses "arising out of or pursuant to." We do not believe there is a significant difference between these slightly different formulations, but do recognize that substantially broader language in the arbitration clause would alter the result of the analysis. *See, e.g.*, *Brown v. ITT*

> *Consumer Fin. Corp.*, 211 F.3d 1217, 1221 (11th Cir.2000)
> (discussing arbitration clause covering "any dispute
> between them or claim by either [party to the contract]
> against the other").

553 F.3d at 1367 n.1. In *Hemispherx* and the other cases cited by Plaintiffs, the court's willingness to compel arbitration was limited because the scope of the agreement in question was itself limited. *See also Dees*, 847 So. 2d at 936 (construing an arbitration clause applying only to claims "arising out of, in connection with, or relating to" the agreement it formed a part of). The arbitration agreements at issue here are far more expansive. Instead of being limited to claims "arising from" a single contract or transaction, the arbitration agreements apply to "*any* prior, current, or future agreement, loan, account, service, activity, transaction (proposed or actual), event or occurrence," and even specifically "includ[e] contract and tort disputes and any other matter." (Docs. 16-3 at 1, 16-5 at 1, 16-7 at 1, 16-9 at 1.) Plaintiffs' argument that their "claims do not arise from the loan agreements" (Doc. 21 at 10) is therefore completely beside the point. Whether or not they arise *from* the agreement, their claims are clearly within the scope of claims subject *to* the agreement.

The wide scope of these arbitration agreements does not pose an obstacle to their enforcement. As explained by the Eleventh Circuit, a clear but broad provision is enforceable:

> There also is nothing unusual about an arbitration clause,
> especially in an account agreement, that requires arbitration
> of all disputes between the parties to the agreement. We
> have enforced such a clause before because it "evince[d] a
> clear intent to cover more than just those matters set forth
> in the contract."

*Board of Trustees of City of Delray Beach Police and Firefighters Retirement System v.*

*Citigroup Global Markets, Inc.*, 622 F.3d 1335, 1343 (11th Cir. 2010) (quoting *Belke v.*

*Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023, 1028 (11th Cir.1982)). *See also*

*Brown*, 211 F.3d at 1221 (enforcing agreement covering "any dispute" between the

parties). Because Plaintiffs' claims fall within the scope of the agreement, and the

breadth of the agreement does not make it unenforceable, Plaintiffs' first argument

fails.

### b. Parties subject to the arbitration agreement

The second objection Plaintiffs raise to arbitration is that "WABT and BOV

seek to enforce an arbitration clause against non-signatories." (Doc. 21 at 10.)

Plaintiffs contend that "there is no evidence . . . that Lunan signed any document

other than as a guarantor on behalf of either Emergystat or Southland Health Services,

Inc." (Doc. 21 at 12.) This is patently untrue, as Lunan clearly signed an arbitration

agreement on his own behalf (Doc. 16-9) in addition to those he signed as a corporate

officer. (Docs. 16-3, 16-5.) Plaintiffs also state that "[i]t is uncontroverted that

Defendants do not have a signed written agreement with Plaintiff subsidiary corporations and parent Paladin." (Id.) But "signed written [arbitration] agreements" actually *were* made with both Southland Health Services and one of its subsidiaries, Emergystat. (Doc. 16-7, Doc. 16-3.) Plaintiffs are correct that Paladin Holdings is not a direct signatory to the agreements, but all of Paladin's claims arise through—and therefore are subject to the arbitration agreements of—its subsidiaries.

The only mention of Paladin in the amended complaint is that it "purchased one hundred percent of the stock of Southland," one of the signatories to the arbitration agreements. (Doc. 75 ¶ 15.) Paladin also purchased Emergystat, another of the signatories. (Doc. 124 at 4–5). Finally, the president and sole shareholder of Paladin is yet another signatory, Larry Lunan.

In their efforts to avoid arbitration, Plaintiffs emphasize that "[i]t is vital for this Court to understand" that each Plaintiff is a separate and distinct entity from the others. (Doc. 21 at 6 n.2.) But untangling the various claims and interests of Paladin, Southland, and its myriad subsidiaries is made worse by Plaintiffs' own treatment of them. Throughout the rest of their submissions to the Court, Plaintiffs ignore the "vital" distinctions and lump all the entities together. For example, in the amended complaint, Plaintiffs begin by explaining that all the various subsidiaries are "referred to collectively as 'Southland.'" (Doc. 75 ¶ 1.) The reason for this is that "[b]y means

of written assignments, all of Southland's subsidiaries . . . transferred to Southland Health Services, Inc. all right, title and interest to any and all claims." (Doc. 75 ¶ 2.) Plaintiffs elsewhere emphasize "the fact that all of the subsidiaries' claims . . . were assigned, prior to litigation, to the parent Paladin, for value, in order to pursue litigation." (Doc. 27 at 5.) In light of these assignments, Plaintiffs' statement that "[n]o allegations have been or could be made that the acts of either Plaintiff Lunan or non-party Emergystat can or should be attributed to either the other subsidiaries or other Plaintiffs" is disingenuous at best. (Doc. 21 at 6 n.2.) Because Paladin's claims are inseparable from its subsidiaries', Paladin appears to be properly bound by the arbitration agreements.

Adding to this conclusion is the arbitration language itself, which purports to bind "personal representatives, agents, employees, **officers**, directors, affiliated companies, **parent companies,** subsidiaries and **shareholders**, present, future[,] or past." (Docs. 16-3 at 1, 16-5 at 1, 16-7 at 1, 16-9 at 1, emphasis added). In many circumstances, the ability of a corporation to bind its shareholders, parent companies, or officers would obviously raise serious concerns. In this case, however, Larry Lunan signed three of the arbitration agreements, one on behalf of himself (Doc. 16-9 at 1), one on behalf of Emergystat (Doc. 16-3 at 1), and one of behalf of Southland (Doc. 16-7 at 2). Significantly, Lunan also happens to be the sole shareholder and president of

Paladin, and able, as such, to act on Paladin's behalf. Especially in light of this, there appears to be little question that Paladin's claims, in addition to Southland's and Lunan's, are subject to arbitration.

### c. Scope of the arbitrator's jurisdiction

Based on the discussion above, it appears to the Court that all of the claims and parties at issue are "referable to arbitration." But deciding the exact scope of the arbitration agreement is not necessarily the job of this Court; the Court must determine if that question is more appropriately left to the arbitrator.

In *First Options v. Kaplan*, the Supreme Court addressed the issue of who should determine arbitrability. 514 U.S. 938 (1995). The Court opined that questions regarding the jurisdiction of the arbitrator were "fairly simple." *Id.* at 943. In a unanimous opinion, the Court announced that "[j]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *Id.* (internal citations omitted). In determining the parties' intent, the Supreme Court warned that lower courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 944 (internal citations omitted).

The Eleventh Circuit took up the question of "clear and unmistakeable evidence" of arbitrability in *Terminix Int'l Co. LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005). In *Terminix*, the court found that the parties clearly and unmistakably evidenced their intention to have arbitrability determined by the arbitrator by incorporating the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), which mandate that the arbitrator will determine his own jurisdiction. *Id.* at 1332 (quoting AAA Rule 8(a), now Rule 7(a), which states that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement"); *see also CitiFinancial Corp., L.L.C. v. Peoples*, 973 So. 2d 332, 340 (Ala. 2007) ("We find the reasoning of the Eleventh Circuit . . . persuasive and hold that an arbitration provision that incorporates rules that provide for the arbitrator to decide issues of arbitrability clearly and unmistakably evidences the parties' intent to arbitrate the scope of the arbitration provision.").

The arbitration agreements here clearly demonstrate the parties' intent to empower the arbitrator with the authority to determine his own jurisdiction. Each agreement states that it is subject to the rules of the AAA. As discussed above, the relevant AAA rule grants the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity

of the arbitration agreement." AAA Commercial Arbitration Rules and Mediation Procedures, Rule 7(a) (June 1, 2009) (.pdf version available for download at www.adr.org). Because the agreements empower the arbitrator to determine jurisdiction, this Court is bound by its obligation to "rigorously enforce agreements to arbitrate." *Hemispherx*, 553 F.3d at 1366.

Plaintiffs' only chance of avoiding arbitration would be to allege fraud in the procuring of the arbitration agreement itself, or else to challenge its very existence. The Supreme Court has cautioned that if a party alleges "fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). This is the natural result of the rule in *First Options*: if the arbitration clause is void from the outset, there is no agreement to arbitrate, and therefore no authority to submit conflicts of any sort to an arbitrator. *Buckeye*, 546 U.S. at 445. Here, although Plaintiffs *claim* to "challenge the very existence of a contract to arbitrate," (Doc. 21 at 10), their actual challenge is only to the *scope* of the agreement. Plaintiffs certainly do not contend that the agreements themselves were procured by fraud, or are the product of forgery or duress. The Court's analysis above, in Parts IV.A.1.(a)–(b), shows that the claims against BOV and WABT are, at a minimum, "referable to arbitration" for purposes of 9 U.S.C. § 3. To

the extent that Plaintiffs wish to argue that claims or parties fall outside the arbitration agreement, it is the place of the arbitrator—not this Court—to decide.

Plaintiffs will be directed to arbitrate their claims against BOV and WABT. It is therefore unnecessary to consider the remaining arguments concerning such claims.

## B. Claims against Citizens State Bank

There are seven counts against Citizens in Plaintiffs' amended complaint.[4] The first five of these—Counts One, Four, Five, Six, and Seven—are for violations of various provisions of the Alabama Code. (Doc. 75 at 12, 15–18.) Count Eight is a claim for common-law negligence. (*Id.* at 19.) The final claim against Citizens is Count Twelve, alleging civil conspiracy. (Doc. 75 at 27.) Before addressing each of these counts, and Citizens' defenses to them, there are four preliminary matters to address.

### 1. Preliminary matters

Citizens has filed three motions to strike, each pertaining to an evidentiary basis relied upon by Plaintiffs in responding to the summary-judgment motion. The first seeks to exclude Plaintiffs' two expert reports. (Doc. 129.) The second motion asks that Plaintiff Lunan's declaration be struck for purposes of summary judgment. (Doc. 130.) The third asks the Court to disallow Plaintiffs' reliance on their own unverified

---

[4] This number excludes the claims for civil RICO violations and for fraudulent suppression, which Plaintiffs have voluntarily withdrawn as to Citizens. (Doc. 81 at 7, Doc. 82 at 1 n. 1.)

interrogatory responses and unauthenticated documents. (Doc. 131.) Before addressing these, however, there is a threshold matter to address: Plaintiffs' standing to bring suit.

### a. Standing

The issue of Plaintiffs' standing is raised in both Citizens' motion to dismiss and its summary-judgment motion. Acknowledging that "[s]tanding is determined at the time a complaint is filed," Citizens points out that the assignments of rights giving rise to some of Plaintiffs's claims were executed *after* the filing of the complaint. (Doc. 117 at 30 (citing Grupo *Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570–71 (2004)).) In their response, Plaintiffs do not dispute that the assignments did take place after the original complaint was filed. (Doc. 124 at 10.) They add, however, that the assignments took place well *before* the filing of the amended complaint. (*Id.* at 33.) Citizens' reply does not controvert this, or otherwise argue that Plaintiffs lack standing under the amended complaint. The Court is satisfied that Plaintiffs have standing to bring their claims.

### b. Motion to strike expert reports

Citizens' first motion to strike (Doc. 129) concerns two expert reports. One report was prepared by Dayne C. Gray, of the firm Matson, Driscoll, and Damico ("the Gray report"). (Doc. 127-19.) The other report was prepared by W. Timothy

Finn II of the Financial Management Consulting Group ("the Finn report"). (Doc. 127-21.)

The Gray report purports to provide accounting expertise, and focuses on alleged discrepancies between amounts transferred *to* Southland from Defendants Dubose and Bell, and the amounts transferred *from* Southland accounts to Dubose and Bell. The report concludes that the amounts that Dubose and Bell received "are in excess of the funds provided by these gentlemen to Southland in the amount of $916,613 and $256,740 respectively." (Doc. 127-19 at 6.)

The Finn report focuses on banking standards of care, and contains several opinions concerning Citizens. The report concludes that Citizens "failed to comply with standard banking practices, failed to exercise due diligence, and failed to observe reasonable commercial standards and adequate standard of care in the handling of many transactions involving Southland Health Services and Emergystat." (Doc. 127-21 at 5.)

Citizens seeks to have these reports struck on several grounds, but primarily because they constitute mere "unsworn preliminary expert reports." (Doc. 129 at 1–3.) Citizens contends that the reports , as such, fall outside the universe of materials that can properly be considered in reviewing a summary judgment motion. (*Id.* at 2 (citing Fed. R. Civ. P. 56(c).) In support of this argument, Citizens cites to *Carr v.*

*Tatangelo*, in which the Eleventh Circuit addressed the admissibility of an unsworn "preliminary report by [an] expert witness" as part of summary judgment review. 338 F.3d 1259, 1273 (11th Cir. 2003). The court found that the district court properly excluded the report from its consideration:

> Importantly, the alleged expert's report is unsworn. Only "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits" can be considered by the district court in reviewing a summary judgment motion. FED.R.CIV.P. 56(c) (emphasis added). . . . Unsworn statements do not meet the requirements of [Rule 56] and cannot be considered by a district court in ruling on a summary judgment motion. Because the preliminary report was submitted without attestation, it had no probative value . . . .

*Carr*, 338 F.3d 1273 n.26 (internal quotation and alteration omitted) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17 (1970)). Under *Carr*, an unsworn opinion can be considered only if there are supporting affidavits, made on personal knowledge, that "show affirmatively that the affiant is competent to testify to the matters related therein." *Id.* (quoting FED. R. CIV. P. 56(e) (now 56(c)(4)). Plaintiffs have submitted no such affidavits from their experts.

Plaintiffs respond that although the "reports may be unsworn, this is not a bar to these reports' admissibility." (Doc. 137 at 4.) But although Plaintiffs criticize

Citizens' reliance on *Carr* as being "only a footnote in a single case," they fail to provide any contrary Eleventh Circuit case law of their own. (Doc. 137 at 6.) Instead, Plaintiffs cite to a handful of district-court cases—some from other circuits—as evidence of what the law is "[i]n the Eleventh Circuit." (*Id.* at 4.) Relying on a footnote themselves from *Medtronix Xomed, Inc. v. Gyrus ENT L.L.C.*, 440 F. Supp. 2d 1300, 1310 (M.D. Fla. 2006), Plaintiffs assert that "unsworn expert reports may be considered at summary judgment where the expert identifies the report at deposition and does not retract the opinions therein." (*Id.*, emphasis added.) But even assuming Plaintiffs' standard to be correct, the admissibility of the reports is far from certain.

Both Grey and Finn were deposed and questioned about their respective reports. Plaintiffs' characterization of these depositions is that both "experts repeatedly voiced their continued support for their conclusions and reaffirmed their opinions." (Doc. 137 at 5.) The depositions themselves indicate otherwise.

### i. Grey's deposition

With respect to Grey, Plaintiffs rely on two sections of Grey's deposition, which allegedly show that he "repeatedly affirmed his report's conclusions, and "was prepared to testify at trial to that extent." (Doc. 137 at 9.) The first section cited by Plaintiffs does nothing of the kind. Instead, Grey merely affirmed the limited scope of his opinion, agreeing that the "sum total and limit of [his] expert opinion" was to

examine the funds transferred from Dubose and Bell to Southland and vice versa. (Doc. 129-1 at 26.) Grey makes no statement regarding his continued support for his report's conclusions.

The second cited portion of Grey's deposition is, at first glance, more promising. Plaintiffs quote the following statement by Grey: "I believe my report states what my opinion is." (Doc. 137 at 9, quoting Doc. 129-1 at 39.) In context, however, this statement is evidence *against* Plaintiffs' contention. Grey was being questioned as to why, without knowledge of whether certain transactions had been authorized by Southland, his report labeled them as "illegitimate." (Doc. 129-1 at 39.) When asked whether this language constituted an accusation of wrongdoing, Grey deflected the question by saying "I believe my report states what my opinion is." (*Id.*) Grey could not remember whether he or his assistant had chosen the "illegitimate" label, but he admitted that they "perhaps could have used a different word." (*Id.*) Far from an endorsement of his written opinion, the cited portion of Grey's deposition only highlights misgivings about the language that he used in the report.

The rest of Grey's deposition casts serious doubt on his continued support for his opinion. Grey admitted that he lacked relevant information in preparing it. He was unaware, for example, whether the supposedly "illegitimate" transactions he examined were made with Southland's permission or not:

> A.    . . . . Now, did we have any documentation to tell us whether anyone authorized them to write a check for cash and put it in their account? I don't have that information.
>
> Q.    Did you have any information that would enable you to provide an opinion as to whether any specific transaction was authorized by the company?
>
> A.    No, not any specific information.

(Doc. 129-1 at 26.) Grey also acknowledged that although he scrutinized funds paid directly from Dubose and Bell to Southland, he failed to take account of any funds used to pay loans on Southland's behalf:

> Q.    To the extent that money from Mr. Dubose's loans went into a Southland account, you've noted it?
>
> A.    Yes.
>
> Q.    But you haven't noted the flow of funds from any of Mr. Dubose's loans directly to vendors or other parties?
>
> A.    I don't—I don't think I've seen those records.
>
> Q.    Okay. That information was not provided to you?
>
> A.    No.

(Doc. 129-1 at 31.) Even more concerning are transactions central to his opinion that Grey simply could not account for. Grey was questioned, for example, about a $65,000 transfer that was missing from his analysis, and he acknowledged its relevance:

Q.   Okay. Why does that [$65,000] payment not appear as an outflow of funds to the company on Schedule A?

A.   As I sit here today, I—I don't—I cannot tell you why it's not included there.

Q.   Should it be included?

A.   Well I see the deposit for the bank statement on 6/30; that it cleared. Unless there's anything indicating that it—that it was sent back, I don't understand why it's not included.

. . .

Q.   Assuming the check was not returned, would that affect your opinion in this case?

A.   It—it could.

Q.   In what way could it affect your opinion?

A.   Well, again, looking at it, it appears to be a check written on Mr. Dubose's account, deposited into a corporate account. So, you know, by what we were —what we were doing, all accounts, you know, sitting here today, this looks like it should have been included.

(Doc. 129-1 at 29.) When confronted with discrepancies between entries in his report and Citizens' own account statements, Grey acknowledged that it "[i]t certainly is possible that I could have made a mistake," and that "other errors in the entries that [he] made" were also possible. (Doc. 129-1 at 52–53.)

These facts, as Plaintiffs tacitly acknowledge, cast serious doubt on the reliability of Grey's report. (Doc. 137 at 6.) But without even reaching the question of *reliability*, these facts are—under Plaintiffs' own proposed standard—fatal to the report's *admissibility*. It can hardly be said, from reading Grey's deposition, that he affirmed the conclusions in his report. *Medtronix*, 440 F. Supp. 2d at 1310.

Plaintiffs seemingly acknowledge that this is the case, and state that "even where an expert partially-disavows [sic] portions of an expert report, the report may nevertheless be admissible." (Doc. 137 at 10.) In support, Plaintiffs rely on *In re Mentor Corp. ObTape Transobturator Sling Products Liability Litigation*, 711 F. Supp. 2d 1348, 1368 (M.D. Ga. 2010). Even if it were binding on this Court, the cited case would do nothing to help Plaintiffs. The court there noted that "[w]ith one exception, [the defendant did] not contend that any of Plaintiffs' experts retracted or disavowed their opinions," and concluded that "[u]nder *these* circumstances, the Court concludes that it may properly consider the unsworn expert reports." *Id.* at 1309 (emphasis added). The circumstances here are quite different, as Citizens *does* contend that Grey's deposition serves to discredit, rather than affirm, his report's conclusions. In these circumstances, where a defendant does contend, supported by the record, that an expert "retracted or disavaowed" his opinion, *In re Mentor* only suggests that an unsworn copy of the opinion should *not* be considered.

If this were not enough, the Grey report itself calls for the same result. The "Scope of Work" section of the report emphasizes that its "conclusions are dependent on [the] documentation being accurate and complete in all material respects." (Doc. 127-19 at 6.) As Grey's deposition shows, the documentation undergirding his opinion was manifestly not "accurate and complete in all respects." In fact, Plaintiffs themselves highlight this fact at several points. They concede that Grey "had not finished his work," and his final calculation "does not include [other] transactions identified by Plaintiffs." (Doc. 124 at 11.) They also claim elsewhere that "Plaintiff Lunan has identified additional sums which were not included in the [Grey] report." (Doc. 137 at 8–9.)

Because the Grey report is unsworn and unsupported by an appropriate affidavit, its consideration for summary-judgment purposes is improper. Even if Plaintiffs are correct that an expert's affirmation of his report at deposition can take the place of an affidavit, no such affirmation can be found here. The Court therefore will not consider the report in its review of the summary-judgment motion.

### ii. Finn's deposition

The Finn report is similarly problematic. Plaintiffs cite the report several times in their summary-judgment response for the proposition that Citizens "ignored obvious conversion of corporate funds." (Doc. 124 at 8, 9, 13, 15, 16.) The report itself

references the "fraud being perpetrated" by the individual Defendants, and opines

that many transactions "were improper, and involved conversion of corporate funds."

(Doc. 127-21 at 12.) The opinion then goes even further, claiming that many of

Dubose's transactions "were obvious conversion [sic] of corporate funds," and that

Citizens was clearly "aiding him in his conversion of company funds." (*Id.*) But at his

deposition, Finn retreated from this aspect of his opinion:

> Q.    And I assume you also conclude that they obtained those corporate funds improperly or without —without proper authorization; correct?
>
> A.    I'm not sure I would agree with the—that I assumed they obtained them without proper authorization. . . . I didn't form an opinion about the propriety of receiving them. My opinion was based on how they got them.
>
>       . . . .
>
> Q.    So, the ultimate question of whether they actually embezzled funds, you're not—you're not making a judgment as to that; correct?
>
> A.    That is not one of my opinions.

(Doc. 129-2 at 14–15.) Finn also admitted that he had "no idea" what happened with

any of the funds after they were transferred. (Doc. 129-3 at 24.) As a result, he could

not say they "were not used for company purposes." (Id. at 26.)

From Finn's deposition it is clear that he had no information concerning the very point for which Plaintiffs cite his report. It essentially assumes what it seeks to prove, or at least what Plaintiffs attempt to prove by it. To the extent that the Finn's report opines that any transaction constituted conversion or fraud, or was otherwise wrongful, those opinions were retracted at Finn's deposition. As a result, this Court should not rely upon them.

### c. Motion to strike Lunan's declaration

Citizens' second motion to strike addresses the sworn declaration of Larry Lunan. (Doc. 130.) The motion does not seek to have the entire declaration struck, but targets approximately twenty specific portions which it alleges are "speculation, conclusory allegations, and statements that are in direct contradiction to the prior testimony in this case." (*Id.* at 3.)

Rather than discuss each statement in order, the admissibility of contested portions will be addressed as they become relevant to the analysis below. The Court, however, can rely only on facts which are properly supported by the evidence, and "set forth by affidavit or otherwise." *Lewis v. Casey*, 518 U.S. 343, 358. The evidence in question must be such that it would be admissible at trial. *See Echaide v. Confederation*

*of Canada Life Ins.*, 459 F.2d 1377, 1381 n.5 (5th Cir. 1972)[5] ("[Rule 56], of course, requires that affidavits be based on personal knowledge and contain only such evidence as would be admissible at a trial."); *see also* FED. R. CIV. P. 56 (c)(2) (providing that a party may object to summary judgment materials that would not be admissible in evidence).

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602. Of course, this does not mean that the source of a witness' knowledge always needs *external* corroboration, since "evidence to prove personal knowledge may... consist of the witness' own testimony." *Id.* But a party cannot create a genuine issue of material fact simply by stating, without any apparent foundation, that one exists. If that were allowed, there would be no meaningful way to discern the issues of fact that are truly genuine. The very purpose of a summary-judgment motion is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To accept a party's own unsupported statements as "proof" would defeat the point of summary-judgment review. Accordingly, the Court will not—and can

---

[5]  The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

not—entertain testimony from Mr. Lunan which is beyond the scope of his own personal knowledge.

### d. Motion to Strike Interrogatory Responses and Exhibits

The subject of Citizens' third motion to strike is Plaintiffs' supplemental interrogatory responses, which Plaintiffs rely on extensively in their response to summary judgment. (Doc. 131.) As with the contested portions of Lunan's affidavit, Citizens objects to numerous assertions made within the discovery responses, on the basis that they are "conclusory and unsupported by specific facts." (*Id.* at 4.) But unlike Lunan's declaration, the discovery responses at issue were not originally made under oath. Accordingly, Citizens also objects to the supplemental interrogatory responses in their entirety, on the basis that they—like the expert witness reports discussed above—are unverified and unsworn.

Plaintiffs reply to this general objection that supplemental responses do not need to be verified. (Doc. 138 at 5.) The only case Plaintiffs cite for this proposition, however, determined that such responses *do* require verification. *See Knights Armament Co. v. Optical Systems Technology, Inc.*, 254 F.R.D. 463 , 467 (M.D. Fla. 2008) ("The purpose of verifying interrogatory responses is to have the party attest to the truth of the responses. Thus, if a party amends or supplements its response, the party must attest to the truthfulness of the new response."). While consideration of unverified

responses would likely be improper, Plaintiffs have also submitted, along with their response brief, signed verification pages from Larry Lunan. (Docs. 138-1, 138-2.)

Even assuming that these now-verified responses are proper to consider, many of the individual assertions they contain are not. At best, Lunan's verification of them puts the responses on the same footing as his declaration, and subject to the same qualifications. This is evidenced by Lunan's own verification statement, which states that the supplemental interrogatory responses are "true and correct *to the best of my knowledge*." (Doc. 138-1 at 10, emphasis added.) The Court cannot rely on them any further than this. Accordingly, any unsupported assertions in the interrogatory responses, particularly those outside the scope of Lunan's personal knowledge, will be excluded from the Court's consideration.[6]

---

[6] One additional argument merits a brief response. Plaintiffs contend that Citizens cannot seek to strike the supplemental responses, because Citizens "has introduced these responses into evidence" on its own. (Doc. 138 at 3.) This argument fails for at least two reasons. First, Citizens was careful to note that it referenced the supplemental responses "*solely* for the limited purpose of trying to identify what transactions the Plaintiffs now claim are at issue." (Doc. 131 at 3 n.1.) Second, there is a vast difference between a party seeking to rely on its own unsupported statements, and an adversary making use of those same statements. While the former is inappropriate, the latter is completely proper, since such statements are explicitly exempted from the hearsay rule as admissions by party-opponent. *See* FED. R. EVID. 801(d)(2).

### 2. Plaintiffs' Claims Against Citizens

#### a. Count One: ALA. CODE § 7-3-420

The first of Plaintiffs' claims against Citizens is for violating § 7-3-420 of the Alabama Code. Title Seven of the Alabama Code is the state's codification of the Uniform Commercial Code ("UCC" or "the code"). This particular provision addresses conversion, as it applies to negotiable instruments:

> An instrument is converted under circumstances which would constitute conversion under personal property law. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. **An action for conversion of an instrument may not be brought by . . . the issuer or acceptor of the instrument** . . . .

Ala. Code § 7-3-420(a) (emphasis added). Citizens relies on the language in bold in making its motion for summary judgment. The UCC defines "issue" to mean "the first delivery of an instrument by the maker or drawer." § 7-3-105(a). Thus, the word "[i]ssuer . . . means a maker or drawer of an instrument." § 7-3-105(c). Citizens argues that Plaintiffs, as the issuers of the instruments in question, are barred under this section from bringing claims for the conversion of such instruments. (Doc. 117 at 30.)

Plaintiffs seemingly concede that this is correct; their only response is to assert that this argument "of course is inapplicable to the conversion claim based on checks made by customers of Southland," since Southland was not the issuer of those instruments. (Doc. 124 at 28.) Plaintiffs do not, however, identify the checks to which they are referring, despite Citizens' assertion that all of the of the conversion claims against it are "based upon checks in which either Southland was the issuer, or else it purports to assert rights on behalf of an assignor who was the issuer (i.e., Emergystat)." (Doc. 117 at 30.)

Because Plaintiffs do not identify which transactions they refer to, the Court has looked elsewhere for guidance, and has located an interrogatory addressed to this exact question.[7] Interrogatory No. 8 asked Plaintiffs to identify, by date and amount, "all transactions involving Defendant Citizens State Bank that Plaintiffs claim violated Alabama Code § 7-3-420 as alleged in Count One of Plaintiffs' Amended Complaint." (Doc. 127-13 at 6–7.) In response, Plaintiffs do not identify these transactions "by date and amount." Instead, they simply reference "Finn's expert report and deposition transcripts" as well as "Exhibit B hereto." (*Id.* at 7.) There is, however, no Exhibit B attached. Finn's report, meanwhile, discusses several checks "written *on Southland's*

---

[7] By looking to Plaintiffs' interrogatory responses, the Court does not mean to suggest that the contents of such responses would be sufficient to overcome summary judgment; any transactions identified in the discovery responses would still need to be supported by admissible evidence.

*account* [that were] payable to Clanton Dubose," but makes no mention of any checks made by customers of Southland that were paid into the accounts of either Dubose or Bell. (Doc. 127-21 at 12–8, emphasis added.)

The Court has also looked to the contents of Plaintiffs' "third supplemental answers and objections." (Doc. 127-20.) It purports to provide "a specification as to the specific transactions that are at issue with respect to each specific count of the complaint asserted against [Citizens]." (*Id.* at 4.) With respect to Count One, Plaintiffs contend that the contents of "Schedules 1, 2, 3, and 5 are at issue." (*Id.*) To the extent that Schedules 1–3 refer to checks, they are checks drawn on Southland accounts. (Doc. 127-20 at 5–9.) Schedule 5 claims to list amounts of "Southland receipts," ostensibly from Southland's customers. It does not, however, identify which amounts were alleged to have been taken by Dubose, much less identify any specific transaction, whether by check number, issuer, date, or even the account into which it was deposited. (Doc. 127-20 at 12.)

By its terms, § 7-3-420 applies only to *instruments*, and Schedule 5 does not identify any instruments that could give rise to such a claim. Although § 7-3-420 provides that conversion may occur "under circumstances which would constitute conversion under personal property law," it is well established under common-law doctrine that undifferentiated funds may not be the subject of a conversion claim. *See*

*Hensley v. Poole*, 910 So.2d 96, 101 (Ala. 2005) (collecting cases). *See also* Part IV.C.1 below. Because an issuer of an instrument may not bring an action for its conversion, and Plaintiffs have not identified—much less provided actual evidence of—any specific instruments for which Southland was *not* the issuer, the Court must conclude that Plaintiffs' claims under § 7-3-420 fail as a matter of law.

### b. Count Four: ALA. CODE § 7-3-307

Count Four alleges violations of § 7-3-307. Citizens has moved for dismissal of this Count on grounds that it does not "create an independent cause of action" and therefore "fail[s] as a matter of law." (Doc. 117 at 30–18.) Plaintiffs respond by asserting that Citizens has failed to show "that a private right of action is precluded." (Doc. 124 at 29.) But it is Plaintiffs, not Citizens, who bear the onus of showing that a particular statute provides a cause of action. *See American Auto. Ins. Co. v. McDonald*, 812 So. 2d 309, 311 (Ala. 2001) ("One claiming a private right of action within a statutory scheme must show clear evidence of a legislative intent to impose civil liability for a violation of the statute."). This Court has a duty of "ascertaining and applying state law," but is powerless to create a cause of action that is not already recognized. *See Beasley v. Fairchild Hiller Corp.*, 401 F.2d 593, 596 (5th Cir. 1968).

Notably, § 7-3-307 does not appear to supply the cause of action in any of the cases citing it. *See, e.g., Brooks ex rel. Vickers v. First Fed. Sav. and Loan Ass'n of*

*Sylacauga*, 726 So.2d 640 (Ala. 1998). At least one court has rejected the attempts of a plaintiff to use the provisions of § 7-3-307 to "piece together the elements" of a novel claim. *See Continental Cas. Co. v. Compass Bank*, 2006 WL 566900 at *10 (S.D. Ala. 2006).

The approach used to determine whether a different UCC provision provides an independent cause of action is also instructive here. The Alabama Supreme Court addressed the question with regard to § 7-1-203 in *Gov't St. Lumber Co. v. AmSouth Bank N.A.*, 553 So.2d 68, 72–73 (Ala. 1989). Section 7-1-203 mandates an obligation of good faith in the performance of contracts. The court determined that § 7-1-203 "does not create a substantive cause of action." *Id.* It rejected an attempt to imply an independent cause of action because "[t]here [was] no indication, either in the text or the comments, that section 1-203 was intended to be remedial rather than directive." *Chandler v. Hunter*, 340 So.2d 818, 821 (Ala. Civ. App. 1976). *See Gov't St. Lumber Co.*, 553 So. 2d at 72 ("We expressly adopt the reasoning of the Alabama Court of Civil Appeals in *Chandler v. Hunter* . . . since § 7–1–203 is directive rather than remedial.").

That same rationale applies here: there is nothing in the text or comments to § 7-3-307 that indicates that it is to be the source of any remedy. To the contrary, the first of the official comments explains the "directive" nature of the section:

> This section **states rules** for determining when a person
> who has taken an instrument from a fiduciary has notice of
> a breach of fiduciary duty that occurs as a result of the
> transaction with the fiduciary. Former Section 3-304(2) and
> (4)(e) related to this issue, but those provisions were
> unclear in their meaning. **Section 3-307 is intended to
> clarify the law by stating rules** that comprehensively
> cover the issue of when the taker of an instrument has
> notice of breach of a fiduciary duty and thus notice of a
> claim to the instrument or its proceeds.

ALA. CODE § 7-3-307 cmt. 1 (emphasis added). Aside from any relevance it may have

to Plaintiffs claims, it is clear that § 7-3-307 does not provide a source of those claims.

Plaintiffs have not produced a single authority to the contrary. Thus, Plaintiffs have

failed to state a claim upon which relief can be granted, and Count Four is due to be

dismissed.

### c. Count Five: ALA. CODE § 19-1-1 *et seq.*

The code section at issue in Count Five is "Alabama's version of the Uniform

Fiduciary Act," or "UFA." *Heffner v. Cahaba Bank and Trust Co.*, 523 So.2d 113, 114

(Ala. 1988). Citizens argues, as with the previous claim, that the UFA does not provide

for an independent cause of action. (Doc. 117 at 30.) Plaintiffs merely respond that

Alabama cases dealing with the statute "do not even dismiss the possibility that there

might not be a private right of action."[8] (Doc 123 at 20.) Once again, Plaintiffs have failed to demonstrate that a separate cause of action was contemplated. The question is closer here, as the Alabama Supreme Court has at least discussed the possibility of being "subjected . . . to liability under § 19-1-9."[9] *Heffner v. Cahaba Bank and Trust Co.* 523 So. 2d 113, 115 (Ala. 1988).

Even if an independent claim does exist, summary judgment would still be appropriate due to the defenses that the statute unmistakably *does* establish. For example, if a fiduciary deposits funds that he holds—as a fiduciary—into his personal account, the UFA provides that bank with significant protection:

> [T]he bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach

---

[8] The Court assumes that the Plaintiff intended "do not even entertain" rather than "do not even dismiss." Whatever Plaintiffs meant to say, the point stands that Alabama courts have not squarely addressed the existence of a independent cause of action under ALA. CODE § 19-1-1 *et seq.*

[9] The amended complaint cites all of Chapter 1 of Title 19 of the Alabama Code, and fails to specify which provision forms the basis of the claim. It certainly is not § 19-1-1 itself, which merely provides that "This chapter may be cited as the Uniform Fiduciaries Act." Section 19-1-9, concerning deposits made into a fiduciary's personal account, seems the most likely candidate under the circumstances, but the specific provision makes little difference: the same standard is employed throughout the Act. *See, e.g.*, § 19-1-4 (in the context of transferring a negotiable instrument), § 19-1-8 (drawing checks on a principal's account).

> of his obligation as fiduciary in making such deposit or in
> drawing such check, or with knowledge of such facts that its
> action in receiving the deposit or paying the check amounts
> to bad faith.

ALA. CODE § 19-1-9. Thus, even if the UFA does provide Plaintiffs a cause of action,

it also requires Citizens to have had "actual knowledge" that the individual defendants

were committing a breach of their fiduciary duties, or else knowledge of facts

rendering its aid an act of bad faith. *See Brooks*, 726 So. 2d at 643 ("The U.F.A.

insulates banks that deal with wrongdoing fiduciaries from liability unless the

beneficiary can show that the bank had **actual knowledge** of the wrongdoing or had

knowledge of such **facts that prove bad faith** on the part of the bank.") (emphasis

added). Plaintiffs rely on the second of these, alleging that Citizens "had knowledge

of such facts that their action in receiving the deposits or paying the checks amounted

to bad faith." (Doc. 123 at 20) (quoting ALA. CODE § 19-1-9) (internal brackets

omitted).[10] But Plaintiffs fail to present facts supporting such knowledge.

The undisputed facts show that Citizens understood Dubose and Bell to be

acting for Southland's benefit. Southland opened an account at Citizens in October

of 2006. Around that time, Southland also approached Citizens for a loan, and was

---

[10] Plaintiffs also contend, without authority, that merely *suspecting* fraudulent activity is also sufficient. (Doc. 123 at 21.) The plain text of § 19-1-9 does not support such a reading.

denied "based on its financial issues." (Doc. 117 at 9.) Citizens was, however, willing to make a loan to Dubose, based on his history with the bank, the fact that he had recently paid back another short-term loan, and because he was willing to pledge real property as collateral for the loan. (*Id.*)[11] Plaintiffs themselves describe how Southland approached Citizens for a loan and was refused: "In October [of] 2006, [Citizens] refused to loan funds to the Company. However, [Citizens] agreed to loan to Dubose *for the benefit of the company.*" (Doc. 124 at 19) (emphasis added) (internal citations omitted). Citizens was given a written consent letter that bore Lunan's signature, which purported to "approve and ratify Clanton Dubose to sign on . . . any loan made to Southland Health Services, Inc. by Citizens Bank, Vernon, Alabama." (Doc. 127-44.) Plaintiffs dispute the authenticity of this letter, but they do not dispute that Citizens received it without notice of any apparent fraud. Citizens relied on the letter, as Plaintiffs themselves put it, "to serve as authorization to debit Southland accounts for payments of debts." (Doc. 124 at 20.) Plaintiffs also describe how Dubose

---

[11] Plaintiffs attempt to deny Citizens' reasons for denying the Loan to Southland and its willingness to deal with Dubose. Their denials, however, are based only on Lunan's deposition and declaration. But because Citizens' reasons are clearly beyond the scope of Lunan's personal knowledge and experience, the Court takes these facts, given by a witness with personal knowledge, to be undisputed. *See* Uniform Initial Order, App'x II (Doc. 17 at 16–17) ("Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*").

presented Citizens with "evidence of a loan obligation from the Company to him."
(*Id.*) The appearance of Southland's financial difficulties, and the need for loans from creditworthy individuals, was heightened by Southland's request for "Bank Official checks" for the purpose of paying vendors that would no longer accept checks from Southland's own accounts. (Doc. 116-4 at 18.)

When Southland's Citizens account was established, Dubose was one of the authorized signatories on it—along with Lunan, Bell, and two others. (Doc. 116-4 at 29.) Because Dubose obtained loans in his own name for the benefit of Southland, and did so with the apparent authority of Lunan and Southland, there was nothing about Dubose's actions, in general, that would indicate that Citizens had knowledge of fraud, or that would put Citizens on notice that honoring his transactions would be in bad faith.

In support of their opposition to summary judgment on their § 19-1-1 claims, Plaintiffs appeal to one of the provisions already discussed, § 7-3-307. But the comments to that very section refer to the rationale behind the UFA, and explain why—under similar circumstances—a bank can safely assume that an individual's actions were proper:

> For example, Doe as President of Corporation writes a
> check on Corporation's account to the order of Doe

> personally. . . . In this case there is no notice of breach of
> fiduciary duty because there is nothing unusual about the
> transaction. Corporation may have owed Doe money for
> salary, reimbursement for expenses incurred for the benefit
> of Corporation, or for any other reason. If Doe is authorized
> to write checks on behalf of Corporation to pay debts of
> Corporation, the check is a normal way of paying a debt
> owed to Doe. Bank may assume that Doe **may use** the
> instrument **for his personal benefit**.

ALA. CODE § 7-3-307 cmt. 4 (emphasis added).

In addition to general allegations that Citizens should have known that Dubose's actions were unauthorized, Plaintiffs also point to specific "red flags" that they claim should have also triggered suspicion on Citizens' part. One such "red flag" is the alleged overall discrepancy between the amounts that Dubose loaned *to* Southland and the amount that he received *from* Southland. This argument, however, is based on the discredited Grey report, which the Court has excluded from consideration. Moreover, the uncontroverted affidavit from Citizens' expert, J. Wray Pierce, shows that the majority of these transactions can in fact be directly traced to "the benefit of Southland and its affiliates." (Doc. 116-14 at 3.)

Plaintiffs also contend that the specific use of some of the funds—for things such as jewelry and car payments—should have triggered scrutiny. But the Alabama

Supreme Court has found that there was no notice, under § 19-1-9, for exactly those sorts of transactions:

> The plaintiff specifically points to certain checks, such as those to Weil Furs, Golbro Jewelers, and Cobb-Kirkland, an automobile dealership, to show that [the bank] should have been on notice that [the fiduciary] was breaching her fiduciary duty. We disagree.
>     We do not believe that the amount and number of transactions carried out on an account containing fiduciary funds, nor the mere names of payees on checks drawn on that account, are sufficient to create bad faith liability based on the bank's action in paying such checks.

*Heffner*, 523 So.2d at 115.

In short, Plaintiffs have not provided any evidence from which Citizens' liability under § 19-1-1 *et seq.* could be inferred, even if such an independent cause of action exists. In addition to disposing of any claims which Plaintiffs might have under the UFA, the UFA also provide Citizens with additional protections from its other claims.

### d. Count Six: ALA. CODE § 7-4-401 *et seq.*

Citizens makes two arguments with regard to Count Six, Plaintiffs' claims under § 7-4-401 *et seq.* The first concerns Citizens' defense under the statute of repose, § 7-4-406(f), which is addressed further below. The second argument is that Plaintiffs are barred from recovering consequential damages, by operation of § 7-4-103(5). Section 7-4-103(5) provides that the measure of damages for failure to "exercise

ordinary care in handling an item" cannot exceed the amount of the item unless there "is bad faith." *See also Bar-Ram Irrigation Products, Inc. v. Phenix-Girard Bank*, 779 F. 2d 1501, 1505 (finding that consequential damages are subject to the bad faith standard of § 7-4-103(5)).

Plaintiffs do not dispute that consequential damages hinge on the presence of bad faith. (Doc. 124 at 32–33.) Instead, they merely argue that "there is ample evidence of Citizens State Bank's knowledge and bad faith." (Id. at 33.) As explained above in Part IV.B.2.c, Plaintiffs have failed to put forward any evidence from which a finding of bad faith could be made. Citizens is correct that consequential damages are precluded.

### e. Count Seven: ALA. CODE § 7-4A-201 *et seq*.

Article 4A of the UCC governs funds transfers. ALA. CODE § 7-4A-102. Citizens' motion to dismiss Count Seven is based on Plaintiffs' failure to identify any funds transfers that are the subject of its Article 4A claims. (Doc. 117 at 31.) Citizens cites to interrogatory responses where Plaintiffs were asked to identify, by date and amount, "all transactions involving Defendant Citizens State Bank that Plaintiffs claim violated Alabama Code § 7-4A-201 *et seq*." (Doc. 127-13 at 8.)

In their second supplemental answers, Plaintiffs did not provide any specific transactions in response. (*Id.*) In their third supplemental answers, Plaintiffs declare

"that the specific transaction on Schedule 7 are [sic] at issue with respect to Count Seven." (Doc. 116-13 at 4.) The only transaction mentioned in Schedule 7, however, is a check; not a wire transfer, nor other transfer subject to Article 4A. (Doc. 116-13 at 15.) Additionally, Plaintiffs' only response to summary judgment is to flatly declare, without support or elaboration, that Citizens' motion as to this claim "must be denied." (Doc. 124 at 28.) Count Seven is therefore due to be dismissed.

### f. Count Eight: Negligence

In addition to UCC and UFA claims, Plaintiffs make a common-law negligence claim in Count Eight. (Doc. 75 at 19.) Citizens has moved to dismiss Count Eight as "preempted by the specific statutory provisions of the Alabama Code dealing with unauthorized transactions." (Doc. 117 at 29.)

The UCC contains an internal rule addressing its preemption of common-law principles. Unless such principles are "displaced by the particular provisions" of the UCC, they only "supplement its provisions." ALA. CODE § 7-1-103(b). Applying this provision, the Alabama Supreme Court has noted that summary judgment is appropriate where UCC provisions "appear[] to displace the plaintiffs' action for common law negligence or wantonness, and the plaintiffs have cited no authority to establish that it does not displace their claims." *C & N Contractors, Inc. v. Community Bancshares, Inc.*, 646 So.2d 1357, 1362 (Ala. 1994). That is certainly the case here,

where Plaintiffs have raised a host of UCC provisions, and do not identify how their negligence claim would not be displaced by those provisions. Moreover, Plaintiffs do not even bother to respond to Citizens' preemption argument in their summary-judgment brief.

Plaintiffs do briefly address the preemption issue elsewhere, in their response to the motion to dismiss filed by BOV and WABT (Doc. 82 at 10–12.) Even here, however, Plaintiffs do not cite a single case from Alabama state court, this district, or the Eleventh Circuit Court of Appeals. Like the plaintiffs in *C & N Contractors*, Plaintiffs have not explained how their negligence claim is not displaced, nor have they cited any relevant authority to show that it is not. Thus, as in *C & N Contractors*, "it appears that [Citizens is] entitled to a judgment as a matter of law" as to the negligence claim. 646 So.2d at 1362.

### g. Count Twelve: Civil Conspiracy

The final claim against Citizens is for civil conspiracy. Civil conspiracy exists to provide plaintiffs with "some means of redress when it is shown that persons have combined and conspired to injure him." *Snyder v. Faget*, 326 So. 2d 113 (Ala. 1976). Accordingly, a claim for conspiracy requires that there "must, of course, be concerted action between two or more persons." *AmSouth Bank, N.A. v. Spigener*, 505 So. 2d 1030, 1040 (Ala. 1986) (quoting *Snyder*, 326 So. 2d 119).

Citizens contends, among other things, that this requirement has not been met since "Plaintiffs have no evidence that Citizens entered into an agreement to commit a tort against Southland." (Doc. 117 at 29.) Plaintiffs respond that "there is ample evidence" of such an agreement. But merely saying there was an agreement is hardly sufficient. *See Helmich v. Kennedy*, 796 F.2d. 1441, 1443 (11th Cir. 1986) ("Statements of fact in a party's brief, not in proper affidavit form, cannot be considered in determining if a genuine issue of material fact exists."). The only citation Plaintiff provide is to their other brief, filed in response the summary-judgment motion from BOV and WABT. The Court accordingly treats the cited section of that brief as being incorporated into Plaintiffs' response to Citizens' motion. Even so, Plaintiffs do not provide any evidence that could prevent summary judgement: Citizens is not even mentioned in connection with the conspiracy claim. (Doc. 123 at 26–27.) Plaintiffs do discuss Citizens in connection with conspiracy claims in its interrogatory responses, but makes only speculative allegations that are not based upon personal knowledge. (Doc. 127-13 at 9–12.) Plaintiffs have failed to put forward evidence of any agreement involving Citizens, and are therefore missing an essential element of their conspiracy claim against Citizens.

In addition to requiring an agreement, civil conspiracy also requires that the object of the agreement be wrongful or tortious. As explained above, Plaintiffs have

failed to provide evidence of Citizens' wrongful conduct. The only claim remaining after the analysis above is Count Six, for making payment on checks that were not properly payable, and that claim is due to be dismissed based on the defenses discussed below. Without other independent claims on which to base it, the conspiracy claim fails as a matter of law; "[a] civil conspiracy cannot exist in the absence of an underlying tort." *Goolesby v. Koch Farms, LLC*, 955 So.2d 422, 430 (Ala.2006).

### 3. Citizens' Defenses

In addition to showing that Plaintiffs have failed to provide evidence such that a jury could find in favor of their claims, Citizens also raises an alternative basis: two defenses that allegedly entitle it to judgment as a matter of law as to all of Plaintiffs' claims. The first defense arises under § 7-3-418, the "final payment rule." (Doc. 117 at 25.) The second is the statute of repose provided by § 7-4-406. (*Id.* at 23.)

### a. Final Payment Rule: § 7-3-418

Section 7-3-418 is a codification of the common-law rule that "a drawee who accepts or pays an instrument on which the signature of the drawer is forged is bound on his acceptance and cannot recover back his payment." *Perini Corp. v. First Nat. Bank of Habersham County*, 553 F.2d 398, 404 (5th Cir. 1977). It provides that:

> (a) Except as provided in subsection (c), if the drawee of a
> draft pays or accepts the draft and the drawee acted on the

mistaken belief that . . . the signature of the drawer of the draft was authorized, the drawee may recover the amount of the draft from the person to whom or for whose benefit payment was made or, in the case of acceptance, may revoke the acceptance. Rights of the drawee under this subsection are not affected by failure of the drawee to exercise ordinary care in paying or accepting the draft.

. . . .

(c) The remedies provided by subsection (a) . . . may not be asserted against a person who took the instrument in good faith and for value or who in good faith changed position in reliance on the payment or acceptance. This subsection does not limit remedies provided by Section 7-3-417 or 7-4-407.

ALA. CODE § 7-3-418. These provisions "expressly appl[y] to actions brought by drawee banks against depository banks." *Cagle's Inc. v. Valley Nat. Bank*, 153 F.Supp.2d 1288, 1293 (M.D. Ala. 2001). Just as the plaintiff in *Cagle's*, Plaintiffs do not dispute that this provision also "applies to claims brought by drawers against depository banks." *Id.* So this Court "does not address that issue" either. *Id.*

Although Plaintiffs devote an entire section of their response brief to addressing § 7-3-418, that section consists of only a single sentence: "Numerous other courts have found genuine factual issues regarding a bank's *lack of good faith* sufficient to avoid summary judgment." (Doc. 124 at 26, emphasis added) This assertion is followed by a footnote listing several cases. These are offered without any analysis or explanation as to their relevance to the present facts.

The lack of evidence for Citizens' bad faith has already been discussed above, and need not be repeated here. It bears emphasizing, however, that when Alabama adopted revisions to Articles 3 and 4 of the UCC, it deliberately "chose to retain the existing good faith definition" rather than accepting the proposed change to the standard, which would have "expand[ed] the good faith concept to include observance of reasonable commercial standards of fair dealing." ALA. CODE § 7-3-418 Ala. cmt. 1. As it currently stands, Alabama's conception of good faith is a subjective standard, defined simply as "honesty in fact in the conduct or transaction concerned." ALA. CODE § 7-3-103(4). This deliberate divergence from the UCC revisions makes it problematic to look for guidance in other jurisdictions. Notably, not one of the cases cited by Plaintiffs is from Alabama. (Doc. 124 at 26 n.7.)

The undisputed facts are that Citizens understood Southland's employees to be personally borrowing money in efforts to keep the company solvent, and therefore believed that payments from Southland to the individual defendants were in repayment for these loans. Especially in light of Alabama's subjective good-faith standard, Plaintiffs have failed to show any evidence that would cast doubt on Citizen's good faith in honoring these transactions. Accordingly, § 7-3-418 operates to bar claims by Plaintiffs against Citizens as a depository bank.

## b. Statute of Repose: § 7-4-406(f)

Citizens asserts that summary judgment is appropriate as to all of Plaintiffs claims due to § 7-4-406(f), in addition to all of the grounds discussed above. Section § 7-4-406 provides limits to the amount of time in which a bank customer can assert that an item[12] is fraudulent:

> Without regard to care or lack of care of either the customer or the bank, a customer who does not within 180 days after the statement and the items or a legible copy or image of the items are sent to the customer, or within one year after the statement or items are otherwise made available to the customer . . . discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.

ALA. CODE 1975 § 7-4-406(f). In addition to the official UCC comments that were adopted along with the UCC text, there is an Alabama-specific comment that deals directly with subsection (f). It explains that the requirements of § 7-4-406(f) are "are in the nature of a statute of repose," and constitute "the periods within which the customer *must* notify the drawee bank of the fraud *or be absolutely barred from recovery*." ALA. CODE § 7-4-406(f) Ala. cmt. (emphasis added).

---

[12] The term "item" is defined in Article 4 as "an instrument or a promise or order to pay money handled by a bank for collection or payment. The term does not include a payment order governed by Article 4A or a credit or debit card slip." ALA. CODE § 7-4-104(a)(9).

Although the terms of § 7-4-406(f) provide for a 180-day period in which to bring notice, that provision appears to have been modified by agreement of the parties. *See* ALA. CODE § 7-1-302(a) ("[T]he effect of provisions of this title may be varied by agreement."). The account agreement between Plaintiffs and Citizens provided for a 14-day period in which to notify Citizens of any unauthorized signatures or alterations, unless Citizens failed to exercise due care. (Doc. 116-4 at 30.) The agreement further provided for a maximum 60-day window, even in the absence of due care. (*Id.*) Those time period begin from the time that the relevant statement was sent or made available. (*Id.*)

Plaintiffs' response to the statute of repose is twofold. First, Plaintiffs contend that § 7-4-406 "was not sufficiently pled," and that "[b]ecause Defendants failed to properly raise this defense in their answers to the amended pleadings, they have waived this defense and cannot rely on it now."[13] (Doc. 124 at 23.) To allow Citizens to rely on § 7-4-406 would, according to Plaintiffs, "surprise and unduly prejudice" them. (*Id.* at 24.) This argument does not warrant much discussion. Citizens' amended answer specifically states, as a defense, that "Plaintiffs' claims are barred and/or limited by Alabama Code 7-4-406." (Doc. 74 at 39.) Additionally, the very first

---

[13] Despite arguing here that Citizens' defense was inadequately pleaded, Plaintiffs condemn Citizens' efforts to dismiss claims on the same as a resort to "hyper-technical pleading standards and formalities." (Doc. 81 at 2.)

interrogatory propounded by Plaintiffs asked the Defendants to "[s]et for the factual basis for each and every Affirmative Defense [they] asserted, or intend to assert in this action." (Doc. 132 at 3.) Citizens response begins by asserting that "Plaintiffs' claims are barred by the applicable provisions of their account agreement with Citizens *and by Alabama Code § 7-4-406(f)*." (*Id.* at 3–4, emphasis added.) The suggestion that Plaintiffs had no notice of this defense is mistaken.

Plaintiffs' second argument is that "Citizens ignores the statutory prerequisite to the application of this statute of repose, *i.e.*, that the 'customer should have reasonably discovered the unauthorized payment.'" (Doc. 124 at 25.) Plaintiffs allege that this prerequisite is lacking, because there is a significant "question of fact" as to "whether Citizens 'provided' the statements to Southland." (*Id.*) The record shows, however, that there is not really a genuine issue of material fact on this point. The parties agree that the Citizens statements were sent to the home address of Clanton Dubose. How the statements came to be sent there, and what became of them afterwards, are questions that Plaintiffs attempt—unsuccessfully—to put into controversy.

According to the sworn affidavit of Eddie Collins, the executive vice-president of Citizens, the initial monthly account was "sent by First Class U.S. Mail to the address provided by Southland on its signature card: P.O. Box 1497, Vernon, Alabama

35592." (Doc. 116-4 at 7.) Shortly after the initial statement was sent, the U.S. Postal Service returned it, saying that the post office box belonged to another company, "and it would not deliver Southland mail to that address." (*Id.*) Citizens then contacted Southland for an alternative address, and was told to send the statements to "Southland Health Services, Inc., c/o Clanton Dubose," at an address which proved to be Dubose's home.[14]

Plaintiffs attempt to dispute this account of the facts, but without providing any facts of their own. The only citations to the record they provide are to Lunan's declaration. (Doc. 124 at 6–7.) As discussed above in Part IV.B.1.c, the Court cannot consider Lunan's testimony when it comes to matters outside his personal knowledge or experience. The mere fact that Lunan declares to "have personal knowledge of each of the factual matters set forth in [his] affidavit" does not qualify him to speak to the motivations and decisions of either Citizens or the U.S. Postal Service. There is no showing of any basis on which Lunan can dispute Collins' explanation for why the statements were sent to Dubose's address, and Plaintiffs have pointed to nothing else to contradict his account. Plaintiffs cannot merely declare that a fact is disputed; such

---

[14] Plaintiffs argue that Citizens had Dubose's home address on file as a result of his prior dealings with Citizens. They do not dispute that the Citizens' employee making the call was not informed at the time that it was Dubose's home address.

declarations "must be followed by a a specific reference to those portions of the evidentiary record upon which the dispute is based."(Doc. 17 at 16–17.)

Even more important to Plaintiffs' argument is what happened to the statements after they were sent to Dubose.[15] According to Collins, account statements were sent every month between October of 2006 (when the account was opened), and September of 2008 (when the account was closed). (Doc 116-4 at 8–17.) The statements were delivered to Dubose's and each month he "would take them to Southland's corporate headquarters in Vernon and turn them over to Southland's bookkeeper, Donica Allison Garland." (Doc. 117 at 11–12.) Garland would "reconcile those statements with the company's own internal accounting records," and then would keep the statements in her office "where they were available for Mr. Lunan or anyone else at Southland to review." (Id. at 12.) This account is supported by the sworn testimony of both Dubose and Garland.

Plaintiffs attempt to dispute aspects of this account, but again without adequate support. Plaintiffs deny that Dubose would take the statement's to Southland's headquarters, or gave them to Garland. The only support for this denial, however, is Lunan's testimony. Because Lunan—by his own account—never saw where the

---

[15] There is a question of whether mailing the statements to Dubose would itself be sufficient notice to Southland on agency principles. But given the facts as described below, the Court need not address this question.

statements were, he certainly cannot testify as to where they were not. The only "fact" which Plaintiffs raise in this regard is the accusation that Garland "cooperated in [the] efforts to take unauthorized monies." This, too, lacks any basis in the record. The same goes for the assertion that the statements were stored in Garland's office; Plaintiffs offer no evidence to contradict this, only the unsupported assertion that "[t]he statements were [not] in the control of anyone other than the Defendants or unindicted conspirators conspiring with them."[16] (Doc. 124 at 7.) The undisputed facts show that the banks statements were delivered to Southland's headquarters on a regular basis. It would be absurd to suggest that delivery of statements to a company's headquarters did not constitute being "sent to the customer." ALA. CODE 1975 § 7-4-406(f). Plaintiffs had sufficient access to the statements to trigger the deadlines imposed by the statute of repose.

The only remaining question, then, is whether Plaintiffs provided notice as required by § 7-4-406(f). They did not. By Lunan's own account, he did not contact Citizens regarding the Southland account until August of 2008, well after the triggering of repose for most of the time that the account was open. (Doc. 116-1 at 83 –84.) Even then, Lunan only placed a phone call stating that he "was investigating"

---

[16] Interestingly, Plaintiffs do *not* dispute the fact that "Ms. Garland would reconcile [the] statements with the company's own internal accounting records," except "to the extent this information was shared with Plaintiffs." (Doc. 117 at 12, Doc. 124 at 7.)

and wanted copies of specific checks, which Citizens promptly furnished. (*Id.*) Lunan did not follow up to report any fraudulent activity. (*Id.*)

In short, Plaintiffs have offered no evidence that timely notice was made.[17] By operation of § 7-4-406(f) and their own account agreement, Plaintiffs are barred from any recovery for transactions involving their account with Citizens. For multiple reasons, then, summary judgment is appropriate as to all of Plaintiffs claims against Citizens.

### C. Claims Against the Individual Defendants

The three remaining individual Defendants are Clanton Dubuse, Dudley Bell, and T. Alan Walls. Of the six counts against them, four are the subject of their motion for summary judgment: Count Two, for common-law conversion; Count Three, for breach of fiduciary duty; Count Nine, for money had and received; and Count Twelve, for civil conspiracy.[18] Each is addressed in turn.

---

[17] The bare statement that "Plaintiffs and their agents informed Citizens that there were unadorned transactions in their account and pointed to certain transactions," (Doc. 127-26 at 8), without actually pointing to any certain transactions, is plainly insufficient to create a genuine issue of material fact.

[18] The individual Defendants also argue against Count Thirteen, for an accounting, and Count Fourteen, for the imposition of a constructive trust. (Doc. 128 at 5.) These arguments were raised for the first time in their reply brief with no opportunity for Plaintiffs to respond; thus, it would be improper for the Court to take up these arguments. The Court also notes that other defenses—such as the doctrine of unclean hands—might have been raised, but were not. Regardless,

### 1. Count Two: Common-Law Conversion

Count Two of Plaintiffs' amended complaint alleges "common law conversion against the individual defendants." (Doc. 75 at 13.) To prevail on a claim for conversion, a plaintiff must show "a wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has . . . the immediate right to possession. " *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 732 F.2d 859, 863 (11th. Cir. 1984) (quoting *Empiregas, Inc., of Gadsden v. Geary*, 431 So. 2d 1258, 1260–61 (Ala. 1983)) (ellipsis in original). This can be shown through "a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property." *Southtrust Bank v. Donely*, 925 So. 2d 934, 939 (Ala. 2005) (quoting *Riscorp, Inc. v. Norman*, 915 So. 2d 1142, 1152 (Ala. 2005)).

While conversion has long provided a remedy for the recovery of personal property, its application to money has been "complicated as a result of the evolution of our economic system." *Donely*, 925 So. 2d at 940. Originally, the rule was that conversion applied *only* to tangible physical property, and there "could be no conversion" of money. *Id.* (citing W. PAGE KEETON ET AL., PROSSSER AND KEETON ON

---

the Court will limit its discussion to the arguments briefed by the parties.

THE LAW OF TORTS, § 15, at 91 (5th ed. 1984)). The rule was then relaxed to include

money that was specifically identifiable, and that could not—by virtue of being in a

container of some kind—be intermingled with other funds. (*Id.*) While different in

practice, the same principle holds true today; money in a conversion action "must be

'described with such reasonable certainty that the jury may know what money is meant

and the defendants protected from another action based upon the same grounds.'"

*Limbaugh*, 732 F.2d at 862 (quoting *Russell v. The Praetorians, Inc.,* 28 So.2d 786 (Ala.

1947)). *See also Donely*, 925 So. 2d at 939 ("Generally, an action for **conversion of**

**money** will not lie unless the money is **specific and capable of identification**.")

(quoting *Riscorp, Inc.*, 915 So. 2d at 1152).

Plaintiffs contend that checks, wire transfers, and ACH transfers are all subject

to conversion claims. Defendants argue that even if such transfers *can* be the subject

of a conversion claim in general, they cannot here because Plaintiffs have failed to

specifically identify the transactions at issue. This appears to be correct: the amended

complaint does not identify any specific transactions under the conversion claim.

(Doc. 75 at 13.) Additionally, many of the exhibits cited by Plaintiffs concern only their

claims against *Citizens*, and are silent as to their claims against the individual

Defendants. (Doc. 127-22 at 4–13, Doc. 127-13 at 4–14.)

Even assuming that the transactions here *could* support a conversion claim, *and* assuming that Plaintiffs had sufficiently identified them, summary judgment would still be appropriate because there was not a wrongful taking of any specific check. The essence of Plaintiffs' claims is not that individual Defendants forged, intercepted, or otherwise misappropriated certain checks, but that they "reimbursed" themselves with far more money than they were entitled to. Quite simply, Plaintiffs seek the return of their money, not the return of any particular check.

The alleged wrongfulness of any specific transaction is undermined by Lunan's own testimony. When asked to confirm that a particular check was one of the "unauthorized" instruments, Lunan explained, at length, his strong disagreement with characterizing any particular check as unauthorized:

> Q.   And that check—who does that check appear to be made out to?
>
> A.   The fifty-one thousand made out to Mr. Dubose.
>
> . . . .
>
> Q.   Now, this is one of the transactions that you have challenged in this case as being unauthorized, correct?
>
> A.   The challenge to authorization, okay, is a net number, in essence the cumulation of all the checks written to Clanton minus repayment for legitimate loans and the net, okay? So to claim this one

specifically or that one specifically—they go into the total. This is included in the accumulation, okay.

. . . .

Q.    If payments were made to Mr. Dubose that were—from Southland's accounts that were repayment of legitimate loans that he made to the company or expenses that he personally incurred on behalf of the company, you do not have an objection to him getting repaid for those legitimate expenses?

A.    No, sir.

. . . .

Q.    And my question is if you had seen this check written to Mr. Dubose for fifty-one thousand dollars or an image of this check, would that have raised concerns for you?

A.    I would have assumed that was a repayment for the two hundred thousand dollars that he borrowed, okay?

Q.    . . . . Would you have done any follow-up to confirm that or would you have just accepted that it was a repayment for money he had borrowed and not queried Mr. Dubose about it?

A.    Under the impression that Mr. Dubose loaned the company money, I probably wouldn't have questioned that. It's no the single check, it's the accumulation of checks. I never questions Mr. Dubose until I got the printout of him receiving 1.3 million.

Q.    So you knew he was incurring expenses on the company's behalf, so if some checks were—went

> from Southland's Citizens account to him, you
> would have naturally assumed he was just getting
> repaid for legitimate expenses?
>
> A.    That is absolutely correct.

(Doc. 116-1 at 124–25.) Other portions of Lunan's deposition and affidavit indicate,

consistent with this exchange, that he did not authorize Dubuse or Bell to take the

*amounts* they allegedly took. But in light of Lunan's explanation here, Plaintiffs cannot

legitimately maintain that any specific transaction was "unauthorized" as such.[19]

Thus, Plaintiffs cannot show an essential element of their conversion claim: that the

taking or use of any specific instrument was wrongful. Summary judgment is therefore

appropriate with respect to Count Two.

### 2. Count Three: Breach of Fiduciary Duty

The third count of the complaint alleges breach of fiduciary duty against the

individual Defendants "[a]s directors and officers of Southland." (Doc. 75 at 14.) In

their motion for summary judgment, the individual Defendants concede that they are

officers subject to fiduciary duties. (Doc. 119 at 9–10.) They also do not dispute, after

---

[19] This is also confirmed by the work of Plaintiffs' own expert, Grey. He was tasked by Plaintiffs with looking at the net difference between the overall "inflow" and "outflow" between Southland and the individual Defendants, without regard to specific transactions. (Doc. 129-1 at 25.) The "sum total and limit of [Grey's] expert opinion" was that the amounts received by Dubose and Bell were greater than the amounts they had loaned to Southland, *not* that any particular check or other transfer was improper. (*Id.* at 26.) While the actual opinion produced by Grey is inadmissible for present purposes, the scope and purpose his work, as described in his deposition, is telling.

the issue was raised in Plaintiffs' response brief (Doc. 125 at 19), that Florida law applies to the breach-of-fiduciary-duty claim, since Southland is incorporated in the state of Florida. (Doc. 128 at 7.)

Under Florida law, corporate officers and directors "owe a fiduciary duty to the corporation and to the shareholders and must act in good faith and in the best interest of the corporation." *Rehabilitation Advisors, Inc. v. Floyd*, 601 So.2d 1286, 1288 (Fla. Dist. Ct. App. 1992). As fiduciaries they "cannot deal in funds or property of the corporation to [their] own advantage." *Pruyser v. Johnson*, 185 So.2d 516, 521 (Fla. Dist. Ct. App. 1966) (citing *Orlando Orange Groves Co. v. Hale*, 144 So. 674 (Fla. 1932)). They also are forbidden to "make any profit or acquire any other personal benefit or advantage [that is] not also enjoyed by the fiduciary beneficiary, and if they do, they may be compelled to account to the beneficiary in an appropriate action." *Cohen v. Hattaway*, 595 So.2d 105, 107 (Fla. Dist. Ct. App. 1992) (citing *Seestedt v. Southern Laundry, Inc.*, 5 So.2d 859 (Fla. 1942)).

The individual Defendants contend that summary judgment is appropriate on the fiduciary-duty claims for several reasons, but each is misplaced. They rely extensively on the shield from liability provided by ALA. CODE § 10A-2-8.42, but as noted above, Florida law governs the claims for breach of fiduciary duty. The individual Defendants have not pointed to any equivalent provision of Florida law.

The individual Defendants also contend that the claims for breach of fiduciary duty fail because Plaintiffs "fail to consider the other, substantial factors that led to Southland's demise." (Doc. 119 at 12.) Needless to say, a fiduciary breach need not be solely responsible for the failure of a company in order to be actionable. The extent to which other factors may have contributed—or even been entirely responsible—for Southland's collapse is entirely beside the point. Another argument is based on the level of "personal commitment . . . with Southland and its entities" that the individual Defendants shared. (Doc. 119 at 13–14.) But the fact that the individual Defendants may have had Southland's best interest at heart with regard to many of their actions does not insulate them from liability for any breaches of their duties.

Central to the individual Defendants' motion for summary judgment is the assertion that all transactions were legitimate, that "[a]ny company funds received by the individual Defendants were repayment of personal loans granted to Plaintiffs, reimbursements for expenses or loans to Dudley Bell." (Doc. 119 at 9.) This issue is far from settled, however. Even though the Grey report's account of these discrepancies has been excluded, there are still genuine questions as to the extent that the individual Defendants netted a profit.[20] Even Defendants' own expert opinion is

---

[20] As discussed above, Citizens cannot be charged with knowledge, or even notice, of the alleged impropriety of the individual Defendants' conduct. But this does not have any bearing on whether the conduct was improper in fact. Similarly, although the Court finds that Plaintiffs have

not definitive; it shows at most that a "majority of the transactions" were done for the benefit of Southland, indicating that at least some could not be considered that way. (Doc. 116-14 at 3.)

Plaintiffs also point to other circumstances from which a breach of fiduciary duty could be inferred: the $3,300 in monthly rent for a "repair shop and ice skating rink" that Dubuse charged to Southland, and Bell's purchases of personal items on a nonexistent "deferred compensation agreement." (Doc. 125 at 22–23.) There is no need to recount all circumstances from which inferences of self-dealing could be made. Taking the evidence in the light most favorable to Plaintiffs, there are genuine questions of material fact regarding whether, in making and repaying such loans from Southland funds, Dubose and Bell dealt in Southland's funds to their own advantage.

Finally, the individual Defendants assert that the silence of T. Alan Walls, regarding the actions of Dubose and Bell, does "not [provide] a legally cognizable claim for breach of fiduciary duty." (Doc. 119 at 11.) But no support is offered for this assertion, and several Florida cases hold otherwise. *See, e.g.*, *Artec Group, Inc. v. Chugach Management Services, Inc.*, 470 F.Supp.2d 1353, 1356 (M.D. Fla. 2006) ("A duty to disclose arises when a fiduciary relationship is present.") (citing *Friedman v.*

---

failed to identify any *specific* transactions that could support a conversion claim, this does not preclude a finding that the individual Defendants were, in the aggregate, misappropriating funds from Southland.

*Am. Guardian Warranty Servs., Inc.*, 837 So.2d 1165, 1166 (Fla. Dist. Ct. App. 1966)).

"A fiduciary has a fundamental duty to furnish information that entails not only a

negative duty not to misinform, but also an affirmative duty to inform when that

silence might be harmful." *Rushing v. Wells Fargo Bank, N.A.* 752 F. Supp. 2d 1254,

1265 (M.D. Fla. 2010) (internal alterations omitted) (quoting *Glaziers & Glassworkers*

*Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc.*, 93 F.3d 1171, 1180 (3d Cir.

1996). Thus, summary judgment on Count Three is due to be denied as to all three of

the individual Defendants.

### 3. Count Nine: Money Had and Received

Count Nine of Plaintiffs amended complaint is for "money had and received."

(Doc. 75 at 21.) Walls is not implicated here; only Dubose and Bell are the subjects of

this claim. (*Id.*) In their motion to dismiss this count, Dubose and Bell refer to case law

involving "unjust enrichment" rather than "money had and received," but the two

share similar requirements:

> In order to prevail on claims of unjust enrichment and
> money had and received, "the plaintiffs must establish that
> the defendants hold money that, in equity and good
> conscience, belongs to the plaintiffs, or that the defendants
> hold money that was improperly paid to the defendants
> because of mistake or fraud."

*State Farm Fire and Cas. Co. v. Evans*, 956 So.2d 390, 400 (Ala. 2006) (quoting *Funliner of Alabama, L.L.C. v. Pickard*, 873 So.2d 198, 209 (Ala. 2003).

Dubose and Bell assert that summary judgment should be granted because "[a]ll company funds received by Dubose and Bell were proper reimbursements or authorized by CEO of Southland Larry Lunan." (Doc. 119 at 16.) But this assertion only serves to illustrate that there is a genuine dispute *does* exist. The propriety of Dubose and Bell's "reimbursements" is not clear from the record, as discussed earlier. Additionally, whether Dubose and Bell's actions were "authorized" is vehemently disputed.[21] Summary judgment is therefore not appropriate on this claim.

### 4. Count Twelve: Civil Conspiracy

The same principles of civil conspiracy, discussed above at Part IV.B.2.g, apply here as well. A claim of civil conspiracy requires an underlying wrong, as well as an agreement to commit that wrong. *Spigener*, 505 So. 2d at 1040. Unlike the claim for conspiracy against Citizens, there are surviving claims here that could support a conspiracy claim. The remaining question is whether there is any evidence of "concerted action" between the individual Defendants.

---

[21] As to the overall amounts that the individual Defendants are alleged to have taken, not with respect to individual transactions. See above at Part IV.C.1.a.

If Plaintiffs are successful in demonstrating any of their substantive claims, a reasonable juror could also find in favor of Plaintiffs that the individual Defendants worked together to that end. As Plaintiffs point out, Dubose and Bell co-signed loans and signed checks on each other's behalf. (Doc. 125 at 32.) It would be reasonable to infer, based on the apparent interactions of the individual Defendants in preparing such checks, that they were acting in concert. While Plaintiffs do not muster much evidence in support of the conspiracy claim, there is at least enough in the record for the Court to conclude that summary judgment is inappropriate at this stage.

## V. Conclusion

In light of the analysis above, Plaintiffs will be directed to arbitrate their claims against WABT and BOV. Citizens' motion for summary judgment will be GRANTED as to all of Plaintiffs Claims against it. Summary judgment is likewise due to be GRANTED as to Plaintiffs' common-law conversion claim, but DENIED as to the other claims against the individual Defendants. Separate orders consistent with this opinion will be entered.

Done this 9th day of August, 2012.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
[167037]